UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAPHAEL BERNSTEIN, et al., <br><br>                  Plaintiffs, <br><br>       -against- <br><br> JPMORGAN CHASE BANK, N.A., et al., <br><br>                  Defendants. | 24-CV-3552 (JGLC) <br><br> **OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs Raphael and Jane Bernstein, an elderly couple, were defrauded out of nearly $3 million by their former part-time personal assistant. The Bernsteins, along with their sons John and Daniel, bring this action not against that assistant, but against the banks who they claim violated their own policies and promises by failing to alert them to the obvious fraud. Two sets of Defendants—Bank of America and Chase—now move to dismiss this action. Although the facts as alleged are certainly tragic, nearly all of Plaintiffs' claims fail against these banks. Their claims for violations of the Uniform Commercial Code, Truth in Lending Act, and the Electronic Funds Transfer Act were brought too late, and their claims for negligent misrepresentation fail because the Bernsteins did not have the requisite special relationship with the Banks. Additionally, Plaintiffs failed to give adequate notice of their Uniform Commercial Code claims. However, the Court finds that Plaintiffs have plausibly alleged a claim under General Business Law Section 349. For these reasons and for those stated below, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss.

## BACKGROUND

### I.    Facts

Plaintiffs Raphael and Jane Bernstein (together, the "Bernsteins") are an elderly couple residing in Ridgewood, New Jersey. ECF No. 1-1 ("Complaint" or "Compl.") ¶ 3. John and Daniel Bernstein (together with the Bernsteins, "Plaintiffs"), their sons, hold power of attorney for their elderly parents and are therefore named as parties to the case. *Id.* ¶ 4. The Bernsteins maintain an American Express ("Amex" or "American Express") platinum card for which they pay an annual fee, a checking account and multiple credit cards with JPMorgan Chase Bank, N.A. ("Chase")[1], and investment and checking accounts at BOFA Securities, Inc., d/b/a Bank of America, N.A. ("Bank of America," and together with Chase and Amex, "Defendants" or the "Banks"). *Id.* ¶¶ 6, 7. Because the Bernsteins maintain high checking account balances and invest significant funds, the Banks provide them with private banking services. *Id.* ¶¶ 7, 40.

From 2018 through 2023, a part-time personal assistant (the "Assistant")[2] worked for the Bernsteins. *Id.* ¶ 8. Plaintiffs allege that, beginning around March 2022 through 2023 (the "Fraudulent Period"), the Assistant fraudulently charged the Bernsteins' Amex and Chase credit cards in excess of two million dollars. *Id.* ¶ 9. The Assistant bought computers, electronics, gaming equipment, and assorted collectables from Amazon, PayPal, and eBay. *Id.* ¶ 10. The PayPal and eBay accounts were setup without the Bernsteins' knowledge, and the purchased items were shipped to the Assistant's home and office, as well as to the homes of multiple

---

[1] On June 14, 2024, the parties stipulated to substitute Defendants JPMorgan Securities d/b/a JPMorgan Chase, JPMorgan Securities d/b/a JPMorgan Private Bank, and JPMorgan Chase & Co with Defendant JPMorgan Chase Bank, N.A. ("Chase"). *See* ECF No. 27.

[2] The Assistant has since been arrested and charged with one count of wire fraud by the U.S. Attorney's Office for the State of New Jersey. *Id.* ¶ 20.

accomplices. *Id.* Additionally, emails from Amazon, PayPal, and eBay were sent to separate email folders so that the Bernsteins would not receive notice of the purchases. *Id.* Plaintiffs further allege that the Assistant hid credit card statements from the Bernsteins, paid off credit balances with unauthorized transfers, opened a new line of credit, withdrew money using the Bernsteins' ATM cards, and cashed checks made payable to himself from the Bernsteins' bank account. *Id.* ¶ 11.

The Bernsteins allege that they were completely unaware of the Assistant's fraudulent activities and that he was not authorized to use their credit cards nor given access to any banking account. *Id.* ¶¶ 12–13. Plaintiffs contend that during the period of fraudulent activities, the Bernsteins maintained possession of their American Express and Chase cards and continued to make their usual purchases. *Id.* ¶ 12. Plaintiff's claim that in light of the Bernsteins' historical purchasing pattern, spanning many years, the Assistant's lavish spending would have been an abnormal deviation from their normal spending during the Fraudulent Period. *Id.* ¶¶ 14–19.

Plaintiffs have been unable to recover a series of disputed charges from the Banks. Some charges have been refunded and then re-charged while other refund requests have been denied. *See id.* ¶¶ 47–53. For instance, Chase has reported a charge back of $750,000 which shows as a debit on a credit card with a $50,000 limit. *Id.* ¶ 53. This charge back has severely impacted the Bernsteins' credit score. *Id.* Chase has also frozen a $165,000 deposit in a checking account the Bernsteins have with the bank. *Id.* As of the filing of the Complaint, Plaintiffs were unable to determine the final accounting of the refund amounts owed, which has been complicated by various credits and clawbacks from Bank of America. *Id.* ¶ 52. *Id.*

### A.  Chase Bank Activity

Plaintiffs allege that in 2019, the Bernsteins' son Daniel and his executive assistant contacted JPMorgan Chase to express concerns about cybersecurity and to inquire about security measures the bank uses to protect client assets. *Id.* ¶ 29. They received an email dated July 11, 2019, from JPMorgan Private Bank stating that the firm would "reimburse clients for losses on their accounts that are a result of unauthorized access to our systems through no fault of their own." *Id.* ¶ 29. Plaintiffs allege that they relied on this personal assurance and Chase's extensive marketing campaign to continue their financial relationship with Chase. *Id.* ¶ 29.

The Bernsteins first noticed suspicious activity on February 13, 2023, during a phone call with a private banker at Chase bank. *Id.* ¶ 21. Raphael Bernstein had called to request that the bank close the couple's joint Chase checking account as he sought to streamline his banking, and this was not the couple's primary checking account. *Id.* Upon opening the account profile, the banker noticed suspicious transactions and initiated a conference call with Chase's fraud department and the Bernsteins' son John. *Id.* ¶ 22. During the call, the parties reviewed the checking and credit card accounts and identified a series of fraudulent transactions dating back to October 2022, totaling $703,795. *Id.* After the call, the Bernsteins' Chase credit cards and ATM card were cancelled, new Chase credit cards were issued and mailed to them, and a provisional credit was issued on their account for the transactions identified during the call. *Id.*

Based on the fraudulent transactions discussed during the call, John and Daniel Bernstein subsequently obtained written authorization from their parents as well as account passwords and Powers of Attorney to conduct their own investigation into the fraud. *Id.* ¶ 23. Upon review of the Chase checking account statements and credit card statements, including ATM withdrawals and ACH payments from the Bank of America checking account, they uncovered a pattern of

suspicious transactions beginning in March 2022 and occurring through February 2023. *Id.* ¶¶ 16, 24. Plaintiffs allege that the Assistant began testing the waters by using their Chase credit card to make small fraudulent purchases before making larger transactions. *Id.* ¶ 25.

The Bernsteins' March 2022 credit card statement associated with their Chase Sapphire Reserve showed a few unauthorized purchases, the largest of which was for approximately $220. *Id.* ¶ 16. The August 2022 through September 2022 statement showed over one-hundred Amazon purchases worth thousands of dollars and four separate payments ranging from $5,000 to over $26,000. *Id.* ¶ 17. The October 2022 through November 2022 credit card statement showed charges of $161,312.17 and payments of $182,106.66. *Id.* ¶ 18. The December 2022 through January 2023 statement showed purchases of $73,377.56 and payments of $68,078.35 and the January 2023 through February 2023 statement shows purchases of $151,664.71 and payments and credits of $196,043.77. *Id.* ¶ 19. Plaintiffs allege that the account's credit limit is $35,000 and the pattern of transactions included in the Complaint is a shocking deviation from their typical spending pattern, which might include carrying a four-figure balance on their credit card during any given month. *Id.* ¶¶ 15, 18.

## B. Bank of America Activity

In January 2021, two Bank of America employees called Daniel Bernstein and his executive assistant to express concern about the Bernsteins' Assistant. *Id.* ¶ 34. However, at the time, the Bernsteins' accounts showed no irregular activity. *Id.* Plaintiffs allege that Bank of America reassured them, consistent with a letter dated October 29, 2014, that they were proactively monitoring their account for fraud. *Id.* This October 2014 letter was sent to the Bernsteins after they contacted Bank of America in 2014 to learn about how their accounts were being protected from cybersecurity threats and included information about online banking

monitoring, early fraud warning signs, banking alerts, and Zero Liability Fraud Protection. *Id.* ¶¶ 37–38. Plaintiffs allege that they relied on this personal letter from Bank of America, the bank's extensive marketing campaign, personal banking services, and security features associated with their "Advantage Relationship" checking account (including 24/7 security protection and fraud monitoring) to continue their financial relationship with the bank. *Id.* ¶¶ 39–40.

On February 14, 2023, the Bernsteins contacted Bank of America to request a fraud check and an inventory of their checking account. *Id.* ¶ 31. The following day, a Private Client Manager assigned to the Bernsteins at Bank of America informed the Bernsteins that after reviewing their account, no suspicious activity had been found. *Id.* On February 17, 2023, after repeated requests, Bank of America provided the Bernsteins with copies of the last 12 monthly account statements. *Id.* ¶ 32. The statements revealed that Bank of America had been mailing the monthly statements to the Bernsteins' accountant at an old, invalid address. *Id.* As a result, the Bernsteins were unaware of the unauthorized transfers being made from their Bank of America account to Chase, American Express, and Paypal. *Id.* Plaintiffs allege that between April 4, 2022, and February 15, 2023, the Bernsteins' Assistant transferred $2,409,751 to Chase and American Express without authorization. *Id.* ¶ 33. Plaintiffs allege that despite the suspicious activity and their lengthy history with the bank, they never received any fraud alerts from either their private banker or the fraud department at Bank of America. *Id.*

## II.    Procedural History

On April 8, 2024, Plaintiffs initiated this action in the Supreme Court of the State of New York. Compl. In their complaint, Plaintiffs assert six causes of action: (1) negligent misrepresentation, (2) violation of the Truth in Lending Act ("TILA"), (3) violation of the Uniform Commercial Code ("UCC") Article 4, (4) violation of the UCC Article 4-A, (5)

violation of the Electronic Fund Transfer Act ("EFTA"), and (6) violation of New York General

Business Law ("GBL") Section 349. *See id.* One month after Plaintiffs filed the Complaint, on

May 8, 2024, Defendants removed the action to this Court. ECF No. 1. On June 7, 2024, both

Bank of America and Chase filed motions to dismiss. ECF Nos. 18, 19 ("BofA Mem."), 20, 22

("Chase Mem.").[3] Plaintiffs filed their oppositions to both motions on July 29, 2024. ECF Nos.

30 ("BoA Opp."), 31 ("Chase Opp.").[4] Bank of America and Chase filed their replies on

September 13, 2024. ECF Nos. 32 ("BoA Reply"), 33 ("Chase Reply").

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the

complaint liberally, accepting all factual allegations in the complaint as true, and drawing all

reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008)

(internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff

alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

---

[3] Plaintiffs bring similar claims against Defendant American Express. However, all proceedings in this matter related to American Express are stayed pending completion of arbitration deadlines. *See* ECF No. 23.

[4] Along with their opposition papers, Plaintiffs' counsel submits affidavits which allege and append documents in support of new facts that were not present in the Complaint. ECF Nos. 30-1, 31-1. Except as noted *infra* at n.8, "[t]he Court may not and has not considered any factual allegations that were introduced for the first time in either Plaintiff's opposition affidavit or briefs because 'courts cannot consider new factual assertions in an affidavit submitted in opposition to a motion to dismiss.'" *Regan v. Vill. of Pelham*, No. 19-CV-7987 (NSR), 2021 WL 1063320, at *4 (S.D.N.Y. Mar. 19, 2021) (quoting *Colliton v. Bunt*, 709 F. App'x 82, 83 (2d Cir. 2018)).

U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id.* at 679.

## DISCUSSION

The Court considers each of Plaintiffs' claims, first finding that they fail to adequately allege that the Bernsteins had a special relationship with the banks as required for their negligent misrepresentation claim. The Court then addresses Plaintiffs' Truth in Lending Act claim, finding that it is time barred, and that the circumstances do not warrant equitable tolling. Then, the Court considers Plaintiffs' Uniform Commercial Code claims. The Court first finds that the UCC claims should be dismissed as to Chase and Bank of America because Plaintiffs fail to plead facts sufficient to provide fair notice of the claim. The Court also denies leave to amend, because the claims are time-barred and therefore amendment would be futile. The Court further finds that Plaintiffs' UCC Article 4-A claim against Bank of America is governed by the Electronic Funds Transfer Act and therefore must be dismissed. Then, the Court addresses Plaintiffs' EFTA claim, finding it to be time-barred and ineligible for equitable tolling. Lastly, the Court analyzes Plaintiffs' General Business Law § 349 claim and finds that both Bank of America and Chase engaged in consumer-oriented conduct, and that Chase's conduct was plausibly materially misleading. The Court further finds that Plaintiffs have plausibly alleged direct injury as an element of GBL § 349, and the claim survives the motion to dismiss.

I.      **Plaintiffs' Negligent Misrepresentation Claim Fails Because They Do Not Have a Special Relationship with the Banks**

To state a claim for negligent misrepresentation, Plaintiffs must establish that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that [it] should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

Plaintiffs' claim fails on the first element. "The existence of a special relationship is a fact-intensive, case-by-case inquiry; however, this has not precluded courts from dismissing claims due to a failure to adequately plead this element." *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 345 (S.D.N.Y. 2023) (internal citation and quotations omitted). While the standard of a special relationship in this context is "less rigorous than that of a fiduciary duty," it does require "a closer degree of trust between the parties than that of the ordinary buyer and seller." *Alley Sports Bar, LLC v. SimplexGrinnell, LP*, 58 F. Supp. 3d 280, 293 (W.D.N.Y. 2014) (internal citations and quotations omitted). "In the commercial context, whether a special relationship exists turns on three factors: whether the defendants 'held or appeared to hold unique or special expertise'; whether there is a special relationship of 'trust or confidence'; and whether the 'speaker was aware of the use to which the information would be put and supplied it for that purpose.'" *JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, 585 F. Supp. 3d 474, 479 (S.D.N.Y. 2022) (quoting *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-04697 (CM), 2016 WL 6459832, at *8 (S.D.N.Y. 2016)).

Here, Plaintiffs cannot meet these three factors. First, Plaintiffs have not plausibly alleged specialized expertise. Although Plaintiffs argue that the private bankers had such expertise, "[n]egligent-misrepresentation claims based on special expertise arise when a defendant misrepresents scientific or technical facts, such as a product's health benefits, or the maintenance requirements of airplanes." *Chung v. Pure Fishing, Inc.*, No. 20-CV-3983 (RPK) (CLP), 2022 WL 866769, at *6 (E.D.N.Y. Mar. 23, 2022); *see also Tradeshift, Inc. v. Smucker Servs. Co.,* No. 20-CV-3661 (MKV), 2021 WL 4463109, at *8 (S.D.N.Y. Sept. 29, 2021) ("A defendant's superior knowledge of the particulars of its own business practice is insufficient to establish a special relationship, and generally, a special relationship does not arise out of an ordinary arm's length business transaction between two parties.") (internal citations and quotation marks omitted). No representations of that nature were made here.

Second, the Complaint does not plausibly allege that the relationship between Plaintiffs and the banks was anything more than a typical bank-customer relationship. "Generally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995). Though Plaintiffs argue that having private bankers who worked with the Bernsteins over several years sufficiently meets this factor, courts have repeatedly found that a lender-borrower relationship does not create a special relationship. *See Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410 (MKB), 2014 WL 4677120, at *15 (E.D.N.Y. Sept. 19, 2014) (collecting cases). Indeed, Plaintiffs have not cited, and the Court has not found, any case law indicating that a private banking relationship gives rise to a special relationship between the parties.

Lastly, Plaintiffs cannot demonstrate that the Banks were aware that Plaintiffs would rely on any particular expertise. Plaintiffs point to the Banks' respective advertisements of their fraud

protection measures and that Plaintiffs relied on the representations about those protections. However, the Banks' advertisement also cannot give rise to a negligent misrepresentation claim. *See Stan Winston Creatures, Inc. v. Toys "R" Us, Inc.*, 4 Misc. 3d 1019(A), 2004 WL 1949071, at *5 (N.Y. Sup. Ct. Sept. 1, 2004) (finding that where the parties had an arms' length interaction, "the mere allegation that plaintiffs relied on advice received from [a business] about the [business'] production and marketing. . . and that [the business] was aware of any such reliance, does not suffice to state a claim for negligent misrepresentation") (internal citation and quotation marks omitted); *see also Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826 (MKB), 2015 WL 5579872, at *25 (E.D.N.Y. Sept. 22, 2015) ("Plaintiffs do not cite any cases in support of the proposition that a special relationship may be based on an advertisement directed at consumers and intended to induce reliance and courts have consistently held that advertisements alone are not sufficient.").

Because the Court finds that neither Bank of America nor Chase have a special relationship with the Bernsteins, the Court does not consider the parties' arguments regarding the alleged misrepresentation and any reliance thereupon. *See Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 548 (S.D.N.Y. 2012) ("[Without t]he existence of [a] special relationship . . . a negligent misrepresentation claim cannot proceed."); *JTRE Manhattan Ave. LLC*, 585 F. Supp. 3d at 479 ("New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties.") (internal citation omitted). As such, Plaintiffs' negligent misrepresentation claims against Bank of America and Chase fail.

**II.     Plaintiffs' TILA Claim Is Time Barred and Equitable Tolling Is Not Warranted**

Plaintiffs next claim that Chase violated TILA, by failing to look into the fraudulent charges. As an initial matter, TILA does not require a bank to investigate fraudulent charges. "Based on the wording of section 1643, . . . in order to state a claim the Plaintiff must allege that one of the conditions described in the statute has not been met." *Volovnik v. Benzel-Busch Motor Car Corp.*, No. 09-CV-10595 (DAB) (JLC), 2010 WL 3629819, at *5 (S.D.N.Y. July 29, 2010), *report and recommendation adopted*, No. 09-CV-10595 (DAB) (JLC), 2010 WL 3629815 (S.D.N.Y. Sept. 16, 2010). Plaintiffs make no such allegation, and instead contend that "[i]n this case, the extraordinary and novel nature of the transactions imposed a duty to inquire and should have alerted American Express and Chase to the danger of fraud." *See* Comp. ¶¶ 67–77 (detailing Plaintiffs' TILA claim).

Nonetheless, Chase maintains that this claim is time-barred. "TILA was enacted to promote the 'informed use of credit' by consumers." *Latouche v. Wells Fargo Home Mortg. Inc.*, 752 F. App'x 11, 12 (2d Cir. 2018) (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232 (2004)). "Under 15 U.S.C. § 1640(e), claims for damages pursuant to the TILA must be brought within one year from the date of the occurrence of the violation." *Gonzalez v. J.P. Morgan Chase Bank, N.A.*, 228 F. Supp. 3d 277, 291 (S.D.N.Y. 2017). "[D]istrict courts in this circuit have measured the start of the TILA's statute of limitations 'from the point at which a consumer would reasonably have been put on notice that a violation had occurred.'" *Weiner v. JPMorgan Chase Bank, N.A.*, No. 21-CV-5957 (JPO), 2022 WL 1570717, at *2 (S.D.N.Y. May 18, 2022) (quoting *Schwartz v. HSBC Bank USA, N.A.*, 160 F. Supp. 3d 666, 680 (S.D.N.Y. 2016)).

Based on Plaintiffs allegations, they were on notice that fraudulent activity occurred with respect to their Chase card by February 13, 2023. Compl. ¶ 21. That day, Raphael Bernstein called a private banker at Chase, and spoke with the Chase fraud department, identifying a series of fraudulent transactions dating back to October 2022. *Id.* ¶ 22. Plaintiffs waited until April 5, 2024 to file this action. By failing to file within one year of discovering the fraud and Chase's alleged failures, Plaintiffs' TILA claim is time-barred.

Plaintiffs request that the Court apply equitable tolling to save this claim. Compl. at 11. Equitable tolling applies in "rare and exceptional circumstances, where . . . extraordinary circumstances prevented a party from timely performing a required act, and the party acted with reasonable diligence throughout the period she sought to toll." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal citation and quotation marks omitted). "To qualify for equitable tolling, a plaintiff must show that some extraordinary circumstance, such as fraudulent concealment of the cause of action, stood in the way of bringing suit and that [Plaintiffs] had been pursuing [their] rights diligently." *Latouche v. Wells Fargo Home Mortg. Inc.*, 752 F. App'x 11, 13 (2d Cir. 2018).

Plaintiffs allege that "extraordinary circumstances stood in the way of the Bernsteins discovering the fraud any sooner," Chase Opp. at 11, but Plaintiffs make no allegations of extraordinary circumstances in existence from the date Plaintiffs were on notice of the fraud. Instead, it appears they worked with Chase to try to uncover the extent of the fraud and to recoup what they lost. Throughout that year, however, they did not bring suit against Chase for its alleged failure. And Plaintiffs do not and cannot claim that Chase "prevented [them] from accessing the courts to vindicate their rights." *Gonzalez v. J.P. Morgan Chase Bank, N.A.*, 228 F. Supp. 3d 277, 292 (S.D.N.Y. 2017) (finding equitable tolling unavailable where there were "no

plausible allegations that any acts by the defendants prevented the plaintiff from accessing the courts to vindicate [their] rights"). Accordingly, Plaintiff's TILA claim as to Defendant Chase is DISMISSED.

### III. Plaintiffs' UCC Claims Are Dismissed for Failure to Provide Fair Notice and Inapplicability

Plaintiffs assert claims against Chase and Bank of America for violation of the Uniform Commercial Code ("UCC") Articles 4-406 and 4-A as they relate to "[t]he fraudulent transfer from the Bernsteins' Bank of America account." Compl. ¶ 79. "Article 4 governs bank deposits and collections" while "Article 4-A governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers." *Fischer & Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 797–98 (2d Cir. 2011) (internal citations and quotation marks omitted). For the reasons stated below, the Court first finds that the UCC provisions at issue do not apply to Chase's alleged conduct. Second, the Court concludes that the claims against Bank of America likewise fail.

#### A. Plaintiffs' UCC Claims Are Dismissed as to Chase for Failure to Provide Adequate Notice

Chase asserts that the cited UCC sections do not apply to Chase credit card transactions. Chase Mem. at 19. Plaintiffs concede that their UCC Article 4-A claim should be dismissed. Chase Opp. at 2, n.1. Plaintiffs do not, however address the applicability of UCC Article 4 to Chase. Therefore, Plaintiffs have conceded this argument by failing to address it in their opposition. *See, e.g.*, *Cardoso v. Wells Fargo Bank, N.A.*, No. 21-CV-8189 (KMK), 2022 WL 4368109, at *9 (S.D.N.Y. Sept. 20, 2022) ("Plaintiffs do not respond to these arguments in opposition . . . and accordingly, these claims are dismissed as abandoned."); *Scott v. JPMorgan Chase & Co.*, No. 13-CV-646 (KPF), 2014 WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014), *aff'd*, 603 F. App'x 33 (2d Cir. 2015) ("Plaintiff has failed to respond to [Defendant's] arguments . . . [and] [i]n doing so, Plaintiff effectively concedes the [arguments.]") (collecting cases).

14

Additionally, Plaintiffs only mention Chase with respect to the UCC Article 4 Claim by stating the fraudulent transfers came from a Bank of America account to a Chase account. Compl. ¶ 82. This contention alone does not amount to fair notice which would enable Chase to answer and prepare for trial. *See Kalter v. Hartford Ins. Co. of the Midwest,* 24 F. Supp. 3d 230, 235 (E.D.N.Y. 2014) (dismissing plaintiffs' complaint for failure to give adequate notice where complaint contained "only broad, vague and generalized allegations"). As such, the UCC Claims are DISMISSED as to Chase.

### B.  Plaintiffs' UCC Claims Are Dismissed as to Bank of America

For Bank of America, Plaintiffs claim that they violated UCC Article 4 because they failed to exercise ordinary care in preventing these fraudulent charges. Compl. ¶ 81, 82. In particular, Bank of America "did not alert the Bernsteins of the clearly fraudulent series of transactions." *Id.* ¶ 82. Plaintiffs further assert that Bank of America's security procedures were not commercially reasonable, and Bank of America did not accept the payment order in good faith. *Id.* ¶ 87. These allegations, however, fail to state a claim under UCC Article 4, and in any event, the claims are time-barred.

### 1.  Plaintiffs Fail to Provide Adequate Notice of Their UCC Article 4 Claim and the Claim is Time-Barred

UCC Article 4 imposes a duty upon depositors to inspect their bank statements and canceled checks, and to notify their bank of any problems or irregularities. *See* N.Y. U.C.C. Law § 4-406 (McKinney). Bank of America asserts that the Complaint fails to give Defendants fair notice of the UCC Article 4 claim because it merely alleges that the Assistant made checks out to himself and cashed them. BofA Mem. at 8–9. The Court agrees that Plaintiffs' allegation does not amount to fair notice that would enable Bank of America to answer and prepare for trial, and warrants dismissal. *See Kalter,* 24 F. Supp. 3d at 235 (dismissing Plaintiff's complaint for failure

to give adequate notice where complaint contained "only broad, vague and generalized allegations"); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 197 (N.D.N.Y. 2015) ("[A] pleading that contains only allegations which 'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." (quoting *Sheehy v. Brown*, 335 Fed. App'x 102, 104 (2d Cir. 2009)).

"Although the pleading standard plaintiff[s] must meet does not require an exhaustive catalogue of every fact, a complaint entirely lacking in specific allegations is simply not sufficient." *Josie v. City of New York*, No. 21-CV-2486 (ARR) (RER), 2023 WL 3765063, at *5 (E.D.N.Y. June 1, 2023). Here, Plaintiffs simply state that the Assistant "cashed checks made payable to himself drawn on the Bernsteins' account." Compl. ¶ 11. They do not allege which checks fall within their claim, nor any related details (such as the amount of money, number of checks, and dates of checks). "Because these sweeping allegations are devoid of factual enhancement, . . . [Plaintiffs'] claim[] relating to [UCC Article 4 is] dismissed." *Josie*, 2023 WL 3765063, at *5.

Dismissal for failure to provide adequate notice is often granted with leave to replead. *See Simmons v. Abruzzo*, 49 F.3d 83, 86–87 (2d Cir. 1995) ("[I]f the court dismisses the complaint for failure to comply with Rule 8, it should generally give the plaintiff leave to amend."). However, Bank of America asserts that any such amendment would be futile because the claim is time-barred as a matter of law. BofA Mem. at 9. Under UCC § 4-406, "[i]f the customer fails to notify the bank regarding an unauthorized signature within one year of receiving his statement, the customer is precluded from bringing an action against the bank." *Elden v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 08-CV-8738 (RJS), 2011 WL 1236141, at *6 (S.D.N.Y. Mar. 30, 2011).

Here, Plaintiffs assert that they received their Bank of America statements on February 17, 2023, Compl. ¶ 32, but make no allegations that they notified Bank of America of any fraudulent checks. Indeed, Plaintiffs do not dispute Bank of America's assertion that they did not notify Bank of America regarding any fraudulent checks. Their failure to do so concedes this point. *See Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief."). As such, the Court finds that Plaintiffs failed to notify Bank of America of any fraudulent checks and DISMISSES their UCC Article 4 claim as to Bank of America without leave to amend.

### 2. Plaintiffs' UCC Article 4-A Claim Is Governed by the EFTA

Plaintiffs assert that the "fraudulent transfers from the Bernstein [sic] Bank of America account are . . . regulated by Article 4A, N.Y. U.C.C. Law § 4-A-201, 202, 203, which was enacted to address electronic fund transfers." Compl. ¶ 85. In contrast, Bank of America asserts that "Plaintiffs fail to state an Article 4A claim because Article 4A does not apply when the EFTA governs the disputed transfers." BofA Mem. at 10.

"Article 4-A creates a scheme to set clear rules as to who bears the loss for unauthorized transactions." *Niram, Inc. v. Sterling Nat'l Bank*, 697 F. Supp. 3d 15, 21 (S.D.N.Y. 2023), *appeal withdrawn*, No. 23-7661, 2024 WL 1985513 (2d Cir. Apr. 10, 2024) (internal citation and quotation marks omitted). However, "Article [4A] does not apply to a funds transfer any part of which is governed by the Electronic Fund Transfer Act of 1978." *New York by James v. Citibank, N.A.*, No. 24-CV-659 (JPO), 2025 WL 251302, at *21 (S.D.N.Y. Jan. 21, 2025) (quoting NY UCC § 4-A-108). "The EFTA allocates loss from unauthorized electronic fund transfers . . . from consumer accounts, generally capping a consumer's losses so long as the consumer reports an unauthorized transfer within certain statutory time periods." *Id.* at *4. The official comment to

Article 4-A states that if a "funds transfer is made . . . by means of an automated clearing house, [the] ETFA applies to the ACH part of the transfer." N.Y. U.C.C. Law § 4-A-108 (McKinney). In this case, the only "unauthorized transfers" Plaintiffs identify with respect to Bank of America are outgoing automated clearing house ("ACH") payments. Compl. ¶ 32. Because the EFTA applies to plaintiffs' ACH claims,[5] their UCC Article 4-A claims are DISMISSED.

## IV.    Plaintiffs' EFTA Claim Is Time Barred and Equitable Tolling Is Not Warranted

Plaintiffs assert that Defendants violated Regulation E of the Electronic Fund Transfer Act. *Id.* ¶ 90. They claim that the Bernsteins "were led to believe that Chase and Bank of America were closely monitoring their accounts for fraud and that the Bernsteins would be alerted if any fraud was detected by the Defendants' sophisticated monitoring systems." *Id.* ¶ 93.

"The EFTA provides a 'basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems,' to protect 'individual consumer rights.'" *Yuille v. Uphold HQ Inc.*, 686 F. Supp. 3d 323, 337 (S.D.N.Y. 2023) (quoting 15 U.S.C. § 1693(b)). "To state a claim under the EFTA, plaintiffs must allege that the accounts in question (1) were demand deposit, savings deposit, or other asset accounts; (2) established primarily for personal, family, or household purposes; and (3) that the unauthorized electronic fund transfer was initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account." *Bodley v. Clark*, No. 11-CV-8955 (KBF),

---

[5] To the extent Plaintiffs refer to the Assistant's use of their ATM card to withdraw money, Compl. ¶ 11, that too is governed by the EFTA. *See* 15 U.S.C.A. § 1693a(7) ("[T]he term 'electronic fund transfer' . . . includes, but is not limited to, . . . automated teller machine transactions."); *Zarate v. Chase Bank*, No. 22-CV-1178 (AMD) (LB), 2023 WL 5956334, at *3 (E.D.N.Y. Sept. 13, 2023) ("An ATM transaction is an electronic fund transfer.").

2012 WL 3042175, at *4 (S.D.N.Y. July 23, 2012) (cleaned up). Any action for violations of the EFTA must be brought within one year from the date of the occurrence of the violation. 15 U.S.C.A. § 1693m(g).

Bank of America contends that "Plaintiffs had until April 4, 2023 to bring claims relating to the first transfer and until February 15, 2024 to bring claims related to the last transfer." BofA Mem. at 13. Chase[6] argues that "the one-year statue of limitations period began to run on February 23, 2023 at the absolute latest, ten days after Plaintiffs provided the oral notice of the alleged error to Chase." Chase Mem. at 21 (cleaned up). Plaintiffs filed their Complaint on April 8, 2024, and therefore failed to timely assert their claims. *See Johnson v. Wells Fargo Bank, N.A.,* No. 23-CV-10883 (GHW) (JLC), 2024 WL 3187116, at *6 (S.D.N.Y. June 26, 2024), *report and recommendation adopted,* No. 23-CV-10883 (GHW) (JLC), 2024 WL 3429133 (S.D.N.Y. July 16, 2024) (dismissing an EFTA Regulation E claim as time-barred where complaint was filed more than one year after the alleged violation).

Plaintiffs acknowledge that a one-year statute of limitations applies, *see, e.g.*, Compl. ¶ 91, but argue that equitable tolling should be applied here because the Bernsteins acted with reasonable diligence and the Assistant's theft coupled with the Banks' failure to alert the Bernsteins to suspicious activity constitute extraordinary circumstances. *Id.* ¶ 94. As an initial matter, "[w]hether the EFTA permits equitable tolling remains an unsettled question in the Second Circuit." *Roller v. Red Payments L.L.C.*, No. 19-CV-5285 (GRB) (VMS), 2021 WL 505558, at *4 (E.D.N.Y. Feb. 11, 2021), *rev'd on other grounds*, 57 F.4th 85 (2d Cir. 2023). Nonetheless, the Court considers Plaintiffs argument for equitable tolling.

---

[6] Plaintiffs concede that the EFTA does not apply to credit card transactions and assert only that the EFTA applies to the Chase Checking account. *See* Chase Opp. at 14.

In their opposition briefs, Plaintiffs refer to *Sachs v. Citizens Financial Group, Inc.,* where the court tolled the statute of limitations for Plaintiff's ETFA claim while the bank conducted its investigation. No. 20-CV-570 (JBA), 2021 WL 3421710 (D. Conn. Aug. 4, 2021). This case is readily distinguishable. In *Sachs*, the court found the bank "incompeten[t] at best, and purpose[ly] dece[itful] at worst," because it "took fifteen months to 'investigate' claims of fraud that it admitted it never legitimately disputed were fraudulent, promised to reimburse Plaintiff for the full extent of his loss, and then rejected his claims as untimely even though it had failed to timely send Plaintiff statements showing that account." *Id.* at *4.

Here, Chase took less than one month to complete its investigation, *see* ECF No. 30-10,[7] and Bank of America concluded its investigation within five months. *See* ECF Nos. 31-13; 31-19. Additionally, Plaintiffs make no allegation that the Banks ever promised to reimburse Plaintiffs for the full extent of their loss. *Cf.* Compl. ¶ 51 (acknowledging that Bank of America issued "temporary" credits for timely reported transactions). And to the extent Plaintiffs contend that Bank of America failed to timely send Plaintiffs statements, Plaintiffs make no allegation that Bank of America knew or should have known that their operative mailing address had changed. *See* Compl. ¶ 93 ("The Bank of America account statements were sent to the Bernsteins' accountant at an old, invalid address").

Plaintiffs further posit that the Bernsteins' strained mental acuity constitutes an extraordinary circumstance which supports equitable tolling. Although Plaintiffs assert that the

---

[7] Though a motion to dismiss is generally decided on the pleadings, equitable tolling "is an affirmative defense, which means that Plaintiff did not need to affirmatively plead it in [their] Complaint. . . [and where] Plaintiff has fully addressed the issue raised in the instant motion in a supplemental affidavit, . . . the Court may consider in resolving this motion." *Quinn v. United States*, No. 20-CV-3261 (KMK), 2021 WL 738756, at *7 (S.D.N.Y. Feb. 25, 2021) (cleaned up). As such, the Court considers Plaintiffs' affidavits and related exhibits exclusively with respect to their equitable tolling argument.

Bernsteins suffer limited mental acuity and physical mobility, ECF No. 30-1 ¶ 4, John and Daniel Bernstein, who hold power of attorney for their parents and are also Plaintiffs in this action, have alleged no such limitations. Accordingly, Plaintiffs were on notice of the fraudulent transactions as early as February 2023 and have "not alleged that there was anything preventing [them] from filing this lawsuit within one year" of the violation. *Apostolidis v. JP Morgan Chase & Co.*, No. 11-CV-5664 (JFB) (WDW), 2012 WL 5378305, at *8 (E.D.N.Y. Nov. 2, 2012). For this reason, and for the reasons stated *supra* Section II, the Court finds that equitable tolling is unwarranted in these circumstances. As such, Plaintiffs' EFTA claim is DISMISSED as time-barred.

## V.    Plaintiffs Adequately Allege Injury Under GBL § 349

Plaintiffs assert that the Banks are liable under New York General Business Law § 349 because despite the Banks' extensive advertisements concerning their sophisticated fraud protections and personal assurances from Bank of America and Chase, "the Bernsteins did not receive even the most basic of promised fraud alerts after highly suspicious use of their accounts." Compl. ¶¶ 98–99.

"GBL Section 349 prohibits 'deceptive acts or practices in the conduct of any business, trade, or commerce.'" *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (citing GBL § 349). "To state a claim under GBL § 349, a plaintiff 'must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting S*tutman v. Chemical Bank,* 95 N.Y.2d 24, 29 (2000)).

### A. Bank of America and Chase's Conduct Is Consumer-Oriented

"To show that the challenged act or practice was consumer-oriented, a plaintiff must show that it had a broader impact on consumers at large." *Id.* (internal citation and quotation marks omitted). "This requirement is liberally construed . . . and 'may be satisfied by showing that the conduct at issue 'potentially affects similarly situated consumers,'" *Reyes v. Upfield US Inc.*, 694 F. Supp. 3d 408, 419 (S.D.N.Y. 2023) (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010)). However, "[w]here a plaintiff makes only conclusory allegations of impact on consumers at large, a GBL § 349 claim must be dismissed." *Miller v. HSBC Bank U.S.A., N.A.*, No. 13-CV-7500 (RWS), 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015). Courts have found that "a private contract dispute unique to the parties would not fall within the ambit of the statute." *O.K. Petroleum v. Travelers Indem. Co.,* No. 09-CV-10273 (LMM), 2010 WL 2813804, at *5 (S.D.N.Y. July 15, 2010) (cleaned up).

Here, Plaintiffs claim that "Chase has an extensive marketing campaign extolling its superior customer service and fraud protection." Compl. ¶ 28. Chase's website advertises its security features noting that "older adults in particular are at risk for fraud," and stating that the bank has "24/7 credit card monitoring" and "safeguards against suspicious activity." *Id.* Plaintiffs also claim that "Bank of America touts their fraud protection policies to customers, promising extensive account monitoring." Compl. ¶ 36. Bank of America's website states that their "award-winning cybersecurity team delivers comprehensive security 24/7" and they "continuously monitor [] transactions for suspicious activities." *Id.*

Plaintiffs further allege that "[i]f the Defendants failed to protect the Bernsteins['] accounts in such an astounding manner, there is a likelihood that similarly situated customers could suffer damages as well." *Id.* ¶ 101. These allegations sufficiently plead consumer-oriented

conduct. *See Moreland v. Microgenics Corp.*, No. 21-CV-00748 (ENV) (LB), 2022 WL 2657287, at *8 (E.D.N.Y. June 1, 2022) (implying that an extensive marketing scheme, multi-media dissemination of information to the public, or website released to the general public is directed to consumers at large); *Cf. Seidler v. JPMorgan Chase Bank, N.A.*, No. 23-CV-1462 (GHW) (VF), 2024 WL 344551, at *5 (S.D.N.Y. Jan. 12, 2024), *report and recommendation adopted*, No. 23-CV-01462 (GHW) (VF), 2024 WL 343299 (S.D.N.Y. Jan. 30, 2024) (dismissing Section 349 claim where Plaintiff's deceptive conduct allegations were "conclusory and unsupported by factual detail to plausibly suggest the existence of a routine policy or practice that affects the consuming public").

### B. Bank of America and Chase's Conduct Was Plausibly Misleading and Caused Plaintiffs' Injury

As an initial matter, Bank of America does not challenge that Plaintiffs adequately pled that its conduct was materially misleading or caused Plaintiffs' injury. Chase, however, asserts that "Plaintiffs have not shown that Chase committed any materially misleading act, much less one that caused Plaintiffs' injuries." Chase Mem. at 24 (internal citation omitted). In contrast, Plaintiffs assert that "Chase's conduct, including the misleading advertising and the subsequent failure to offer fraud protection services that were an integral part of the banking services purportedly offered by Chase, was a direct cause of the Bernsteins' loss." Chase Opp. at 20.

"To determine whether conduct related to a GBL claim is materially misleading, courts apply 'an objective definition of misleading, under which the alleged act must be likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Chimienti v. Wendy's Int'l, LLC*, 698 F. Supp. 3d 549, 557 (E.D.N.Y. 2023) (quoting *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023)). "Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole."

*Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020) (internal citation omitted). "While it is well settled that in appropriate circumstances, a court may determine at the motion to dismiss stage that an allegedly deceptive misrepresentation would not have misled a reasonable consumer as a matter of law, multiple courts have indicated that such relief should rarely be granted." *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 581 (S.D.N.Y. 2021) (internal citation omitted). With this in mind, and crediting Plaintiffs' allegations, the Court concludes that Plaintiffs have plausibly alleged that Chase's website is likely to mislead a reasonable customer into believing that their Chase bank accounts would be insulated from the alleged fraud at issue in this case.

"In order to plead a § 349 . . . claim successfully, Plaintiffs must [also] allege that they saw the misleading statements of which they complain before they . . . came into [a banking relationship with] Defendant[s]." *Lugones*, 440 F. Supp. 3d at 240; *see also Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014) ("To properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased."). Here, Plaintiffs describe various portions of Chase's website and state that the "Bernsteins relied on [Chase's] personal assurance, along with the extensive marketing campaign[] to continue their relationship with JP Morgan Chase." Compl. ¶¶ 28–29. Assuming these well-pleaded facts are true and drawing all reasonable inferences in Plaintiffs' favor, as the Court must, the Court finds that Plaintiffs have sufficiently pleaded materiality. *See Colpitts*, 527 F. Supp. 3d at 584; *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-154 (JG), 2015 WL 5360022, at *10 (E.D.N.Y. Sept. 14, 2015) (finding the plaintiff's allegation that "he relied in part on the website's representations" sufficient to plead materiality).

Chase also asserts that "Plaintiffs do not and cannot plausibly allege that they sustained their purported losses as a result of materially misleading conduct *by Chase*." Chase Mem. at 25. However, drawing all reasonable inferences in favor of Plaintiffs, Plaintiffs have plausibly alleged that they did not receive the fraud protection services Chase misleadingly told Plaintiffs they would receive. They claim that they relied on this assurance to continue their banking relationship with Chase. "'Lost benefit of the bargain is a viable theory of injury' under GBL § 349." *Kane v. Univ. of Rochester*, No. 23-CV-6027 (FPG), 2024 WL 1178340, at *17 (W.D.N.Y. Mar. 19, 2024) (quoting *Wallace v. Health Quest Sys., Inc.,* No. 20-CV-545 (VB), 2021 WL 1109727, at *6 (S.D.N.Y. Mar. 23, 2021)); *see also In re Anthem, Inc. Data Breach Litigation*, 162 F. Supp. 2d 953, 995–96 (N.D. Cal. 2016) (concluding that plaintiffs, whose sensitive data was stolen by hackers, sufficiently pled a cognizable injury under Section 349 where the defendants failed to disclose that they maintained insufficient data security practices and the plaintiffs would not have entrusted their data to the defendants had they known). By not receiving the fraud protection they were allegedly promised, this failure resulted in losses that the Court can infer Plaintiffs would have not sustained to this degree had Chase provided the protection it promised.

Accordingly, Plaintiffs have adequately pled injury under GBL § 349 and the motions to dismiss Plaintiffs' GBL §349 claim are DENIED.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' motions with respect to Plaintiff's negligent misrepresentation, Truth in Lending Act, Uniform Commercial Code, and Electronic Funds Transfer Act claims. The Defendants' motions to dismiss are DENIED as to Plaintiffs' General Business Law claim. The parties are hereby ORDERED to file a proposed

Civil Case Management Plan and Scheduling Order, as described at ECF No. 8, by no later than

April 21, 2025. The Clerk of Court is respectfully directed to terminate ECF Nos. 18 and 20.

Dated: March 28, 2025
       New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge